Raymond R. Dieppa, Esq. (27690)
Wadsworth Huott, LLP
14 N.E. 1st Avenue
10th Floor
Miami, Florida 33132
Tel: (305) 777-1000, ext. 208
Fax: (305) 777-1001
rrd@wadsworth-law.com

*Attorneys for Plaintiff*,
Billy Warner

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**BILLY WARNER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

Plaintiff,

v.

**TINDER, INC.,**

Defendant.

**Case No.:**

**CLASS ACTION**

**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF**

1. **FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTIVES ACT("FDUTPA"), FLA. STAT. §§ 501.201, et seq.**
2. **ELECTRONIC FUNDS TRANSFER ACT 15 U.S.C. §1693 ET SEQ.,**
3. **CALIFORNIA BUS. & PROF. CODE §§ 17600, ET SEQ.**
4. **CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17500, *ET SEQ*,**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. BILLY WARNER ("Plaintiff"), by Plaintiff's attorneys, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, to challenge the illegal actions TINDER, INC. ("Defendant") with regard to Defendant's misleading business practices, including practice of making misleading automatic renewal offers and continuous service offers, false advertising, unlawful price discrimination, and violations of the Electronic Funds Transfers Act 15 U.S.C. §1693 *et. seq*., that caused Plaintiff and other consumers damages.

2. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to a Plaintiff, or to a Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

3. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

4. Unless otherwise stated, Plaintiff alleges that any violations by Defendant were knowing and intentional, and that Defendant did not maintain procedures reasonably adapted to avoid any such violation.

5. Unless otherwise indicated, the use of any Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendant named.

## JURISDICTION AND VENUE

6. Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because Plaintiff, a resident of the State of Florida, seeks relief on behalf of a Nationwide class, which will result in at least one class member belonging to a different state than that of Defendant, a company whose principal place of business and State of Incorporation are in the State of California. In addition, the matter in controversy exceeds $5,000,000 exclusive of interest of costs. Therefore, both

diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

7. Further, this Court has jurisdiction under 28 U.S.C. 1331, because this action is brought pursuant to the EFTA, 15 U.S.C. 1693 *et seq*.

8. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; (ii) Defendant resides in this judicial district; and, (iii) Defendant conducted business within this judicial district at all times relevant.

9. Because Defendant conducts business within the State of California, personal jurisdiction is established.

## PARTIES

10. Plaintiff is an individual who resides in the County of Dade, State of Florida and a "person" and "consumer" as defined by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203.

11. Plaintiff is informed and believes, and thereon alleges, that Defendant is a company whose State of Incorporation and principal place of business is in the State of California.

12. Plaintiff is informed and believes, and thereon alleges, that Defendant is a worldwide company that promotes itself as a free online dating application.

## FACTUAL ALLEGATIONS

### *General Background And The Tinder App*

13. At all times relevant, Plaintiff is an individual residing within the State of Florida.

14. Plaintiff is informed and believes, and thereon alleges, that at all time relevant, Defendant conducted business in the State of Florida.

15. In or around early 2014, Plaintiff downloaded an "app" called Tinder from Defendant via iTunes, onto his iPhone mobile device.

16. Tinder promotes itself as a dating application for mobile phones, which

promotes itself as follows:

"[Tinder] lets you find people who are within a certain radius of where you are located. You can see the profile pictures of people and their interests, and then qualify YES or NO.

If both qualify positive, Tinder enables a chat room to communicate with the person.

Tinder runs through your Facebook account, so please sign in with your Facebook data. Running is anonymous, so anything you do in Tinder be published on Facebook. Tinder take your public profile and photos and share your interests with others within the radius of Tinder away near where your you are.

With Tinder you can have casual dating, meet the love of your life, or make friends. You decide!

**Tinder is free and is available on iPhone and Android phones**." [1]

17. Plaintiff alleges, on information and belief, that this advertisement, and other such advertisements that Defendant's products were "free," were propagated, controlled, and/or profited from by Defendant, and that Defendant was materially involved in their dissemination to the public.

18. Tinder utilizes a user's location using the GPS built into their phone, then uses their Facebook information to create a profile. A Tinder profile is made up of a user's first name, age, photos and any pages they have 'liked' on Facebook.

19. Tinder then finds a user potential matches within a nearby geographical radius, and suggests potential matches, which a user has the option to like or pass.

20. Tinder's primary draw for consumers is a feature known as a "swipe," which is the act of swiping one's finger on their smart phone's touch screen within the Tinder app either left or right, in order to respectively approve or pass on a

[1] Emphasis added, see http://www.apptinder.com/.

suggested potential match. If both users swipe right and "like" one another, Tinder will create a direct line of communication between the individuals, and allow them to start messaging one another.

21. In downloading the Tinder app, Plaintiff was informed, by various advertisements, promotions, and websites that Defendant's app was a "free online dating app." Defendant holds itself out to be free on its own website, stating "Tinder is free and is available on iPhone and Android phones."[2]

22. Tinder's advertisement and promotions through the iTunes store promotes Tinder as "free" and states: "To download the free app Tinder by Tinder Inc., get iTunes now" As well as that it is a "free download."[3]

23. Indeed, Tinder is universally advertised as "freeware"[4] and "free" software.[5]

24. A true and correct copy of the screenshot from Defendant's ad on the Google App Store is shown as follows[6]:




[3] See Tinder's advertisement offered through the Apple iTunes store at https://itunes.apple.com/us/app/tinder/id547702041?mt=8

[4] See Tinder's advertisement offered through a third party App store at http://downloads.tomsguide.com/Tinder,0301-52985.html

[5] See Tinder's advertisement offered through the Android store at http://xyo.net/android-app/tinder-e08Z.0I/

[6] https://play.google.com/store/apps/details?id=com.tinder&hl=en

25. Tinder has, up until recently, allowed users to enjoy unlimited free swipes and has been a free app.

26. Tinder has never advertised, represented, or otherwise indicated to its customers, including Plaintiff, that the use of its services will require any form or payment. Rather, Defendant continuously held itself out to be a service that was entirely free to consumers, and engaged in a widespread advertising campaign that its services were free.

27. Following years of benefiting from Defendant's marketing, Defendant abruptly began informing consumers on or about March 2, 2015, that consumers would no longer be able to utilize Tinder for the functions which consumers had previously enjoyed free use.

28. According to Defendant, consumers that desired to continue using Tinder uninterrupted are required to purchase an account-level subscription of Tinder Plus, at a cost of $2.99 per month.

29. Specifically, Defendant abruptly informed consumers, including Plaintiff, that they would no longer be able to enjoy unlimited swipes unless they signed up for a Tinder Plus account. Defendant continued to advertise its product as "free" and did not disclose this material fact to consumers who were downloading the Tinder app.

30. Defendant gave no advanced notice of this change to Plaintiff or other consumers.

31. In fact, Plaintiff learned first of this drastic business model change during the middle of his use of the Tinder App, when a screen popped up on his smart phone's screen on or about March 5, 2015 and stated "You're out of likes. Get more likes in 0:00:00. Get unlimited likes with Tinder Plus for $2.99/mo."

32. A true and correct copy of the screenshot from Plaintiff's iPhone showing this

message is shown as follows:

///




33. Plaintiff was under the impression he already had the ability to get "unlimited swipes" without having to pay anything additionally to Defendant. Indeed, this was the "free" service that had been advertised to Plaintiff, and was the reason he downloaded the app.

34. Having unlimited swipes is a necessary requirement for a user to meaningfully use the Tinder app, due in large part to the vast majority of users' matches being either fake users, escort services, or pornography bots.

35. For these reasons, the limited number of swipes Plaintiff was restricted to prevented him from effectively using the Tinder app at all.

36. Upon being unexpectedly provided notice by Defendant that the continued use of Tinder would require additional payment, Plaintiff reluctantly purchased a monthly subscription plan to the Tinder app, for $2.99 per month.

*Tinder's Subsequent Unlawful and Deceptive Withdrawals*

37. On or about March 30, 2015, despite Plaintiff already having been induced to pay $2.99 to continue with the same level of services previously advertised as free, Plaintiff was unexpectedly prompted again by Defendant to pay additional fees in order to continue utilizing the Tinder Plus services he had previously paid for in full.

38. Defendant prompted Plaintiff to "Get Plus for $19.99/Mo" despite the fact that Plaintiff had previously paid $2.99 to subscribe to Tinder Plus, and had, prior to that, enjoyed unlimited swipes for free, pursuant to Tinder's advertisements. A screenshot of the misleading and deceptive message Plaintiff received is shown as follows:




39. Plaintiff subsequently purchased Plus again, and paid $19.99. This was despite Plaintiff already having paid $2.99 for this same service, which overlapped with the timing, and function of services already paid for.

40. Despite double-paying for Tinder Plus, once at a rate of $2.99, and a second time for $19.99, on or about April 9, 2015, Plaintiff was auto-debited $2.99 by Defendant for Tinder Plus.
41. Plaintiff did not authorize Defendant to continue charging him $2.99 for Tinder Plus.
42. Plaintiff reasonably believed his subscription to Tinder Plus for $19.99 superseded his prior purchase of Tinder Plus for $2.99 per month.
43. Defendant misled Plaintiff and other reasonably minded consumers by charging them multiple times for the same services, and by continuing to automatically withdraw funds from their accounts, under highly misleading terms, and without their express "acceptance" or "authorization," written or otherwise, as to these terms.

*<u>Electronic Funds Transfers Act Violations</u>*

44. Plaintiff provided Apple with his bank card number, through the iTunes store.
45. Defendant subsequently charged Plaintiff's account in the amount of $2.99.
46. On or about March 30, 2015, despite Plaintiff already having entered into a recurring payment plan for $2.99 per month, Plaintiff was unexpectedly prompted again by Defendant to pay additional fees in order to continue utilizing the Tinder Plus services he had previously paid for in full.
47. Defendant prompted Plaintiff to "Get Plus for $19.99/Mo." While Plaintiff felt highly misled by Defendant's continuous prices changes, and what he felt to be a breach of his prior agreements to utilize Tinder's services, Plaintiff reluctantly agreed to continue his subscription at a price point of $19.99 per month.
48. Plaintiff reasonably understood that this new subscription agreement would supersede his prior agreement.
49. Any prior written or electronic authorization for Defendant to automatically withdraw funds from Plaintiff's bank account, in the amount of $2.99 per

month, was expressly cancelled by Plaintiff, at the time that he entered into a new electronic funds transfers agreement with Defendant at a new price point.

50. As of on or about March 30, 2015, Defendant did not have Plaintiff's written authorization to automatically deduct funds at a price of $2.99 per month, from Plaintiff's bank account. Such agreement, if it ever existed, was expressly withdrawn and replaced with a subsequent new agreement.

51. On or about April 9, 2015, Plaintiff began to notice monthly re-occurring charges being automatically deducted from his account by Defendant.

52. After some investigation, Plaintiff discovered that Defendants were deducting sums from his account, on a recurring basis, in order to make payments towards his Tinder Plus Account, despite Tinder not having written authorization to make these deductions. The $2.99 per month withdrawal was canceled and superseded when Plaintiff was prompted to purchase and did purchase the same services for $19.99 per month.

53. Defendants continued to deduct this monthly sum from Plaintiff for at least one (1) month without Plaintiff's authorization.

54. Further, Defendants did not provide to Plaintiff, nor did Plaintiff execute, any written or electronic writing memorializing or authorizing the recurring or automatic payments.

55. Plaintiff did not provide Defendants either with a written or an electronic signature authorizing the recurring or automatic payments.

56. Defendant failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled, and in visual or temporal proximity to the request for consent to the offer

57. Plaintiff alleges such activity to be in violation of the Electronic Funds Transfer Act, 15 U.S.C. 1693 et seq. ("EFTA"), and its surrounding regulations, including, but not limited to, 12 C.F.R. §§1005.7, 1005.8, and

1005.9. Plaintiff further alleges this activity to be in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 to 201.213 ("FDUPTA").

///

## CLASS ALLEGATIONS

58. Plaintiff brings this action on his own behalf, and on behalf of all others similarly situated ("The Class").

59. Plaintiff represents, and is a member of the following Class and Subclasses, defined as follows:

Class:

> All persons in the state of Florida that downloaded Defendant's app, Tinder, at any time prior to March 2, 2015.

EFTA Subclass:

> All persons in the United States whose bank accounts were debited on a reoccurring basis by Defendants without Defendants obtaining a written authorization signed or similarly authenticated for preauthorized electronic fund transfers within the one year prior to the filing of the Complaint.

60. Defendant and their employees or agents are excluded from the Class.

61. Plaintiff does not know the exact number of persons in the Class, but believes them to be in the several hundreds, if not thousands, making joinder of all these actions impracticable.

62. The identity of the individual members is ascertainable through Defendant's and/or Defendant's agents' records or by public notice.

63. There is a well-defined community of interest in the questions of law and fact involved affecting the members of The Class. The questions of law and fact common to the Class predominates over questions affecting only individual class members, and include, but are not limited to, the following:

a. Whether Defendant's practices violate the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 to 201.213 ("FDUPTA");

b. Whether Defendant's practices violate the Florida Free Gift Advertising Law, Fla. Stat. §§ 817.415 et. seq.;

c. Whether Defendant's practices violate the Florida False Advertising Law, Fla. Stat. §§ 817.40 et. seq.;

d. Whether Defendant violated the Electronic Funds Transfers Act 15 U.S.C. §1693 et. seq

e. Whether Defendant charged Plaintiff and class members' payment method for an automatic renewal or continuous service without obtaining Plaintiff's and class members' affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms;

f. Whether Defendant failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled, and in visual or temporal proximity to the request for consent to the offer;

g. Whether Plaintiff and the Class are entitled to restitution under the FDUPTA;

h. Whether Plaintiff and class members are entitled to declaratory relief, injunctive relief and/or restitution under the FDUPTA and Florida False Advertising Law, Fla. Stat. §§ 817.40 et. seq;

i. The proper formula(s) for calculating and/or restitution owed to Class members;

j. Whether members of the EFTA Subclass entered into agreements with Defendant to have automatic, or recurring, electronic payments

drawn from their personal accounts to be paid to Defendants towards settlement of the Class members' alleges services received by Defendants;

k. Whether the members of the EFTA Subclass were not provided with, nor did they execute, written agreements memorializing the automatic or recurring electronic payments;

l. Whether Defendants did not request, nor did it provide, EFTA Subclass members with written agreements memorializing the automatic or recurring electronic payments;

m. Whether the members of the EFTA Subclass did not provide either a written ("wet") or otherwise electronic signature authorizing the automatic or recurring electronic payments;

n. Whether, despite not providing written or electronic authorization for payments to be drawn from their accounts, Defendants took unauthorized payments from EFTA Subclass members' accounts;

o. Whether members of the Classes are entitled to statutory damages;

p. Whether members of the Classes are entitled to declaratory relief; and,

q. Whether members of the Classes are entitled to injunctive relief.

64. Plaintiff will fairly and adequately protect the interest of the Classes.

65. Plaintiff has retained counsel experienced in consumer class action litigation and in handling claims involving unlawful debt collection practices.

66. Plaintiff's claims are typical of the claims of the Class which all arise from the same operative facts involving Defendant's practices.

67. A class action is a superior method for the fair and efficient adjudication of this controversy.

68. Class-wide damages are essential to induce Defendant to comply with the federal and State laws alleged in the Complaint.

69. Class members are unlikely to prosecute such claims on an individual basis

since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, e.g., securities fraud.

70. Plaintiff and the Class seek injunctive relief against Defendant to prevent Defendant from forcing consumers to purchase a subscription for Defendant's app.

71. Defendant has acted on grounds generally applicable to the Class thereby making appropriate final declaratory relief with respect to the class as a whole.

72. Members of The Class are likely to unaware of their rights.

73. Plaintiff contemplates providing notice to the putative class members by direct mail in the form of a postcard and via publication.

74. Plaintiffs request certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(2) for equitable relief.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT

[Against Defendant on Behalf of Plaintiff and the EFTA Subclass ]

75. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

76. Section 907(a) of the EFTA, 15 U.S.C. §1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

77. Section 903(9) of the EFTA, 15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

78. Section 205.l0(b) of Regulation E, 12 C.F.R. § 205.l0(b), provides that

"[preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

79. Section 205.10(b) of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205.l0(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." *Id.* at ¶10(b), comment 5. The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." *Id.* at ¶10(b), comment 6.

80. Defendant has debited Plaintiff's and also the EFTA Subclass members' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated for preauthorized electronic fund transfers from Plaintiff's and also the EFTA Subclass members' accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.l0(b).

81. Defendant has debited Plaintiff's and also the EFTA Subclass members' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by Plaintiff or the EFTA Subclass members for preauthorized electronic fund transfers, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.l0(b).

## SECOND CAUSE OF ACTION

## VIOLATION OF THE FLORIDA FREE GIFT ADVERTISING LAW

(Fla. Stat. §§ 817.415 et seq.)

82. Plaintiff incorporates by reference all of the above paragraphs of this

Complaint as though fully stated herein.

83. The Legislature of the State of Florida recognizes that the deceptive misuse of the term “free” and words of similar meaning and intent in advertising by the unscrupulous has resulted in deception of consumers, leading them unknowingly to assume contractual obligations which were initially concealed by the deception.

84. Florida law requires the disclosure of all contingent conditions, obligations, or considerations in any form in connection with the advertising of goods or services using the term “free” or words with similar meaning to that.

85. The Tinder App is an “Item” as defined by Fla. Stat. § 817.415(2)(c).

86. As described above, Defendant engaged in a widespread advertising campaign, which Plaintiff was exposed to in downloading Defendant’s App, whereby it advertised its Tinder App product/service as a “free” service, and as “freeware.”

87. Defendant promoted the Tinder App product as “free” unconditionally.

88. The Tinder App in fact was not “free” and required the additional payment of undisclosed fees, for full constructive and effective use of the product, i.e. unlimited swipes.

89. Defendant’s removal of the unlimited swipe feature, on products that were advertised to consumers as “free” is an undisclosed additional condition of use, which subjects consumers, including Plaintiff, to undisclosed and unanticipated future fees for use of a product that unconditionally was advertised as free.

90. Defendant failed to make clear and conspicuous statements of these conditions or obligations in advertising and promoting the Tinder App.

91. Plaintiff alleges this failure to disclose, coupled with misleading advertising messages disseminated to the public, is a deceptive and unlawful trade practice, pursuant to Fla. Stat. § 817.415(6), and had a tendency to mislead a

reasonably minded consumer, and did so deceive Plaintiff.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE FLORIDA FALSE ADVERTISING LAW

(Fla Stat. §§ 817.40 et seq.)

92. Plaintiff incorporates by reference each allegation set forth above.

93. Pursuant to Florida Statutes § 817.40, et seq., it is unlawful to disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

94. Pursuant to Florida Statutes § 817.41(4), "[t]here shall be a rebuttable presumption that the person named in or obtaining the benefits of any misleading advertisement or any such sale is responsible for such misleading advertisement or unlawful sale."

95. Defendant misled consumers by making misrepresentations and untrue statements about the Tinder App, namely, by instructing Plaintiff and other Class Members that "Tinder is free and is available on iPhone and Android phones," when in fact, additional subscription fees are necessary for consumers to meaningfully use the Tinder App. Defendant failed to disclose to consumers, at the time of their download of the Tinder app, that additional subscription fees would be required, or that they would not be able to receive unlimited swipes. Defendant knew that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members into paying more for something they reasonably believed they had already purchased.

96. As a direct and proximate result of Defendant's misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property. Plaintiff reasonably relied upon Defendant's representations regarding the Tinder App, namely that the Ignition App was downloaded free and clear, and would continue to provide unlimited swipes free of charge without any additional payment. In reasonable reliance on Defendant's false advertisements, Plaintiff and other Class Members downloaded the Tinder App. In turn Plaintiff and other Class Members were provided with an App that turned out to be of significantly less value than what they were led to believe they had purchased, and therefore Plaintiff and other Class Members have suffered injury in fact.

97. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after Plaintiff had purchased the subscription.

98. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

99. The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendant persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendant's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendant to cease their false advertising, as well as disgorgement and restitution to Plaintiff and all Class Members Defendant's revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

FOURTH CAUSE OF ACTION

**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

(Fla Stat. §§ 501.201 et seq.)

[Against All Defendants]

100. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

101. This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 to 201.213 ("FDUPTA").

102. The express purpose of FDUTPA is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

103. Section 501.204(1), FDUTPA declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

104. The sale of the Products at issue in this cause was a "consumer transaction" within the scope of FDUTPA.

105. Plaintiff is a "consumer" as defined by § 501.203, of the FDUTPA.

106. Defendant's Products are goods within the meaning of FDUTPA and Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

107. Defendant's unfair and deceptive practices are likely to mislead – and have misled – reasonable consumers, such as Plaintiff and members of the Class, and therefore, violate § 500.04, of the FDUTPA.

108. Defendant has violated FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

109. The Florida Legislature has held that violations of the Florida Free Gift

Advertising Law constitute per se violations of the FDUTPA, as they are declared to be a deceptive trade practice and unlawful Fla. Stat. § 817.415(6).

110. Separately, Defendant's conduct has caused and continues to cause substantial injury to Plaintiff and members of the Class. Plaintiff and members of the Class have suffered injury in fact due to Defendant's unilateral decision to require subscription service for Defendant's app. Thus, Defendant's conduct has caused substantial injury to Plaintiff and the members of the Class and Sub-Class.

111. Moreover, Defendant's conduct as alleged herein solely benefits Defendant while providing no benefit of any kind to any consumer. Such deception utilized by Defendant convinced Plaintiff and members of the Class that the Defendant's app was free and would not require a fee for its reasonable use. Thus, the injury suffered by Plaintiff and the members of the Sub-Class is not outweighed by any countervailing benefits to consumers.

112. The injury suffered by Plaintiff and members of the Sub-Class is not an injury that these consumers could reasonably have avoided. After Defendant, falsely and universally represented that Defendant's app was available for "free," these consumers suffered injury in fact due to Defendant's refusal to continue to make said app available to consumers that downloaded the app. As such, Defendant took advantage of Defendant's position of perceived power in order to deceive Plaintiff and the Class members to make a payment toward an app only to then require a monthly payment after years of usage. Therefore, the injury suffered by Plaintiff and members of the Class is not an injury which these consumers could reasonably have avoided.

113. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after Plaintiff had purchased the subscription.

114. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this

omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

115. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after Plaintiff had purchased the App.

116. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

117. Here, not only were Plaintiff and the Class members likely to be deceived, but these consumers were actually deceived by Defendant. Such deception is evidenced by the fact that Plaintiff agreed to pay download and use Defendant's "free" app only to be surprised by Defendant's new requirement for a monthly subscription payment. Further deception occurred when Defendant subsequently advertised its Tinder Pro services for $2.99 per month, only to change its price to $19.99 per month after Plaintiff had purchased the subscription.

118. Plaintiff's reliance upon Defendant's deceptive statements is reasonable due to the unequal bargaining powers of Defendant and Plaintiff. For the same reason, it is likely that Defendant's fraudulent business practice would deceive other members of the public.

119. As explained above, Defendant deceived Plaintiff and other Class Members by representing the Tinder App to be a "free" service that provided unlimited swipes, while also failing to disclose that the app would be rendered useless for free users by Defendant's own business decisions, at a later time, and that considerable subscription fees would be required to continue using the applications.

120. Defendant used false advertising, marketing, and misrepresentations, and otherwise unlawfully induce Plaintiff and Class Members to purchase the

Tinder App. Had Defendant not falsely advertised, marketed or misrepresented the Tinder App, Plaintiff and Class Members would not have purchased the Class Products, or would have purchased an alternative and appropriate services that provided the services they believed they were purchasing. Defendant's conduct therefore caused and continues to cause economic harm to Plaintiff and Class Members.

121. Plaintiff and Class Members have been aggrieved by Defendant's unfair and deceptive practices in violation of FDUTPA, in that they purchased and used Defendant's falsely advertised Products.

122. Plaintiff and EFTA Subclass Members have been aggrieved by Defendant's unfair and deceptive practices in violation of FDUTPA, in that they were subjected to an unlawful and unauthorized electronic funds transfer, and had moneys converted from their bank accounts without authorization, by Defendant, due to its deceptive double billing practices.

123. Reasonable consumers must and do rely on Defendant to honestly represent the true nature of its products and services.

124. Defendant has deceived reasonable consumers, like Plaintiff and the Class, into believing the Tinder App was "free" and "freeware," by failing to disclose material terms, including that additional fees would be required to effectively and constructively utilize the product.

125. Defendant then deceived reasonable consumers, like Plaintiff and the Class, into believing the Tinder Pro services were being sold for $2.99 per month, offering this subscription to consumers in a written advertisement, and failing to disclose to consumers that Tinder could and would sharply change the price of said subscription, at a later time, without advanced notice.

126. Defendant then further deceived reasonable consumers, like Plaintiff and the Class, by changing its price and migrating said consumers towards a more expensive paid subscription offering, during the pendency of their already

existing and paid for subscription for $2.99 per month.

127. Defendant then further deceived reasonable consumers, like Plaintiff and the Class, by failing to disclose to said consumers that by signing up for a new Tinder Pro subscription for $19.99 per month, Tinder would not automatically unsubscribe said consumers from their existing $2.99 per month plan, and would continue deducting said moneys from consumers' bank accounts or payment methods, without authorization, thereby double billing customers for identical subscription plans to Tinder Pro.

128. The knowledge required to discern the true nature of the Products described herein are beyond that of the reasonable consumer.

129. Plaintiff and the Class suffered damages and are entitled to injunctive relief. Thus, pursuant to sections 501.211(2) and 501.2105, Florida Statutes, Plaintiff and the Class make claims for damages, attorney's fees and costs.

130. The damages suffered by the Plaintiff and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant.

131. Pursuant to Section 501.211(1), Florida Statutes, Plaintiff and the Class seek injunctive relief for, inter alia, the Court to enjoin Defendant's above-described wrongful acts and practices, and for restitution and disgorgement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, and The Class Members pray for judgment as follows:

- Certifying the Class as requested herein;
- Providing such further relief as may be just and proper.

In addition, Plaintiff, and The Class Members pray for further judgment as follows:

- restitution of the funds improperly obtained by Defendant;
- Any and all statutory enhanced damages;
- All reasonable and necessary attorneys' fees and costs provided by

statute, common law or the Court's inherent power;

- for equitable and injunctive and pursuant to the Florida Deceptive and Unfair Trade Practices Act; and,
- any and all other relief that this Court deems just and proper.

Dated: October 9, 2015

**Wadsworth Huott, LLP**

By: /s/ Raymond R. Dieppa
Raymond R. Dieppa, Esq.
Attorneys for Plaintiff

## TRIAL BY JURY

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff and The Class are entitled to, and demand, a trial by jury.

Dated: October 9, 2015

**Wadsworth Huott, LLP**

By: /s/ Raymond R. Dieppa
Raymond R. Dieppa, Esq.
Attorneys for Plaintiff